**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In Re:

                                    CASE NO.: 8:10-bk-04857-CPM

Montevallo Apartments, LLC               CHAPTER: 11


_____ Debtor(s) _____ /

## DISCLOSURE STATEMENT

## I.    <u>INTRODUCTION AND DISCLAIMER</u>

MONTEVALLO APARTMENTS, LLC, the Debtor herein, provides this disclosure statement to all its known creditors pursuant to 11 U.S.C. Section 1125.  Creditors may vote on a plan by filling out and mailing the accompanying acceptance form to the Bankruptcy Court, or may attend a hearing to consider the acceptance of the plan and present an acceptance at that time.

In order for the plan to be accepted, creditors holding at least two-thirds in the amount and more than one-half of the ballots cast must vote for the plan in each class of creditors.

**NO REPRESENTATIONS CONCERNING THE DEBTOR ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE WHICH ARE OTHER THAN THOSE CONTAINED IN THIS STATEMENT SHOULD NOT BE CONSIDERED BY YOU IN ARRIVING AT YOUR DECISION.  FURTHERMORE, SUCH ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR FOR TRANSMITTAL TO THE BANKRUPTCY COURT.**

**THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. HOWEVER, THE DEBTOR HAS MADE EVERY EFFORT TO ACCURATELY REFLECT ITS FINANCIAL CONDITION IN THE DISCLOSURE STATEMENT.**

## II.   BACKGROUND OF DEBTOR

Montevallo Apartments, L.L.C. ("Montevallo" or the "Debtor") is a Alabama limited liability company whose principal office is located in Pinellas County, Florida. Marc Johnson ("Johnson"), Montevallo's sole member, also resides in Pinellas County, Florida. Johnson has over twenty years experience in the residential apartment complex industry. Johnson currently owns and operates apartment complexes in 7 states with nearly 2000 total units.

The Debtor was formed in 2008 for the purpose of owning and operating an apartment complex in located in Jefferson County, Alabama.  On or about March 13, 2008, Sandhills Bank ("Sandhills") and Montevallo entered into that certain Promissory Note evidencing a loan (hereinafter the "Loan") from Sandhills to Montevallo in the original principal amount of of what was supposed to be $2,465,000.00 for the purchase of Montevallo Gardens Apartments (the "Montevallo Property"), however it is unclear that much was actually funded. As security for the Loan, on or around March 14, 2008, Montevallo granted Sandhills a Mortgage, Security Agreement, Assignment of Leases and Rents, and Fixture Filing (the "Mortgage") on the Montevallo Property.

The Montevallo Property originally consisted of 16 two story apartment buildings divided into 214 leasing units (of which only15 buildings and 198 units are remaining as a result of fire damage).  The Montevallo Property was acquired in a distressed condition for less than $8,500 per unit.  The Debtor's principal (Johnson) has invested substantial sums in rehabilitating the property

pre-petition. The Debtor generates its revenue solely through rental income from the Montevallo Property.

On or about February 16, 2010, Sandhills sold and otherwise transferred the Loan and all documents relating thereto (hereinafter the "Loan Documents") to Pacific Coast Banker's Bank ("PCBB"). PCBB is the current holder of the Loan Documents and owns the indebtedness evidenced thereby.

On or about September, 30, 2009, one of the apartment buildings on the Montevallo Property sustained substantial fire damage resulting in the destruction of 16 units. In December 2009, Montevallo received $451,530.00 in insurance proceeds from Braisfield & Assoc. for the fire damage (hereinafter the "Insurance Proceeds").[1] The Insurance Proceeds were paid via check in favor of Montevallo and Sandhills, the then service agent for the loan. Montevallo sent the Insurance Proceeds check to Sandhills for signature. Instead of endorsing the check, Sandhills, without Montevallo's authorization, deposited the check in a new account at Sandhills. Moreover, the new account was put in the name of Audubon Groves (an affiliate of the Debtor). At the time that the insurance check was sent to Sandhills, Montevallo was not in default on the loan from Sandhills (the December debt service payment was due, but it was not past due).

Notwithstanding repeated requests by Montevallo, Sandhills refused to turnover the Insurance Proceeds to Montevallo. Johnson had informed Sandhills that it would not be cost effective to rebuild the damaged units since the Insurance Proceeds were woefully insufficient to pay for rebuilding. Sandhills, in fact, agreed that the Insurance Proceeds were insufficient to rebuild the units. Instead of rebuilding, Johnson wanted to tear down the damaged building, build a play

---

[1] The Insurance Proceeds translated to approximately $28,000 per destroyed unit. However, the cost of rebuilding the damaged units and building would be in excess of $900,000 or more than $50,000 per unit.

ground in its place, make other improvements to the property, build out and rehabilitate vacant units and use some of the Insurance Proceeds for payment of debt service. Sandhills still refused to release the Insurance Proceeds to Montevallo, and in the interim sold the Loan to PCBB.

Thereafter, Montevallo hired the undersigned attorney to negotiate with PCBB for the release of the Insurance Proceeds. Montevallo proposed to bring the Loan current by using part of the Insurance Proceeds, with the balance to be used for demolishing the damaged building and making the other improvements to the property. Montevallo also advised PCBB that it had a prospective purchaser for the Montevallo Property, and that the Insurance Proceeds were needed to make the property suitable for sale.

PCBB rejected Montevallo's proposal and instead advised Montevallo that PCBB was accelerating the Loan and declaring an immediate default thereunder. Additionally, PCBB informed Montevallo by letter dated March 3, 2010, that on March 4, 2010, PCBB would apply the Insurance Proceeds to the debt owed by Montevallo to PCBB.

Unfortunately the general downturn in the economy coupled with the fire damage led to poor occupancy and rent collection rates and insufficient revenues to meet operating and debt service requirements. Moreover, some tenants were withholding their rent payments because of the damaged condition to the Montevallo Property resulting from the fire. These conditions and PCBB's refusal to negotiate with Montevallo and to turnover the Insurance Proceeds, led the Debtor to file a petition for relief under Chapter 11 of the Bankruptcy Code on March 3, 2010.

III.    BRIEF SYNOPSIS OF OPERATIONS IN CHAPTER 11

The Debtor continues to be engaged in post-petition negotiations with PCBB regarding the Montevallo Property. The Debtor and PCBB have had disagreements regarding the use of post-

petition cash collateral, including the use of the Insurance Proceeds. The Debtor contends that the Insurance Proceeds are property of the bankruptcy estate, and moreover, are needed to repair the Montevallo Property.

On April 19, 2010, PCBB filed a Motion for Relief from Stay and a Motion for Dismissal for Bad Faith Filing, or in the alternative, to transfer venue. PCBB has withdrawn the Motion for Relief from Stay, and has informally agreed to abate the Motion for Dismissal pending resolution of negotiations with the Debtor.

With respect to the fire damage and other issues, the City of Birmingham has sent code violation letters to the Debtor. The Debtor believes that it can remedy these code violations with use of the Insurance Proceeds. The Debtor has provided PCBB with a budget for repairs and PCBB is currently considering whether to release a portion of the Insurance Proceeds based on this budget. Accordingly, the Debtor continues to negotiate with PCBB regarding the use of the Insurance Proceeds.

As noted above, the Debtor had negotiated pre-petition for a prospective sale of the Montevallo Property. Post-petition, the Debtor entered into a General Sales Contract dated April 9, 2010, with David Ruvalcaba and Archer Electrical, Inc. (collectively, the "Purchasers") for the sale of the Montevallo Property for $4,800,000 (the "Sale Contract").[2] Subsequently, the parties entered into an addendum to the Sale Contract providing that prior to closing, the Debtor must make certain repairs, including repairs to 50 units and parking areas and that the damaged building be demolished. The Debtor has received an estimate from a contractor that the entire property could be rehabilitated for sale purposes for between $250,000 and $275,000.

---

[2] The Debtor will file a Motion to Approve the Sale Contract.

The Debtor believes that if it can make the necessary repairs, the Montevallo Property can be sold for approximately $5 million (stated differently, 2.5 times the amount owed PCBB). In the interim, assuming an agreement for the insurance proceeds can be reached, Montevallo appears poised to receive an influx of new tenants as a result of a problems experienced by a neighboring residential apartment complex.

## IV. SUMMARY OF SCHEDULED CLAIMS

### A. Estimated Administrative Expenses:

The Debtor has estimated administrative expenses in the amount of approximately $30,975.00. A brief synopsis of each of the priority expenses is provided below:

| Name | Description of Expense | Amount of Expense |
|------|------------------------|-------------------|
| U.S. Trustee | Quarterly Fees | $975.00 |
| Joel S. Treuhaft | Attorney's Fees | $30,000.00 |
| | **TOTAL:** | **$30,975.00** |

### B. Priority Claims:

The Debtor has estimated Priority claims in the amount of approximately $48,541.10. A brief synopsis of each of the priority expenses is provided below:

| Name | Description of Expense | Amount of Expense |
|------|------------------------|-------------------|
| Tax Asses. Jefferson Cty. | 2009 Property Taxes | $ 18,305.81 |
| Tax Asses. Jefferson Cty. | 2008 Property Taxes | $ 18,234.53 |
| Internal Revenue Service | 940 Payroll Tax | $ 290.42 |
| Internal Revenue Service | 941 Payroll Tax | $ 7,757.02 |
| State of Alabama | State Income | $ 3,953.32 |
| | **TOTAL:** | **$ 48,541.10** |

### C. Estimated Secured Claims:

The Debtor has estimated secured claims in the amount of approximately

$1,853,115.61. A brief synopsis of each of the secured claims is provided below:

| Name | Description of Claim | Amount of Claim |
|---|---|---|
| Jefferson County | Mechanic's Lien (water) | $ 10,391.03 |
| Pacific Coast Bankers' Bank | Deed of Trust | $1,842,724.58 |
| | **TOTAL** | **$1,853,115.61** |

**D.**    **Estimated Unsecured Claims:**

The Debtor has estimated unsecured claims in the amount of approximately

$58,011.69. A brief synopsis of each of the unsecured claims is provided below:

| Name | Description of Claim | Amount of Claim |
|---|---|---|
| Alabama Gas Company | | Unknown |
| Alabama Power | | Unknown |
| Allied Waste | | $ 6,476.95 |
| Apartment Advisors, USA* | | $12,025.31 |
| Apartments.com | | $ 990.90 |
| AT&T | | Unknown |
| Bentwood Place Apartments | | $ 5,735.91 |
| Birmingham Water Works | | Unknown |
| Birmingham Waters & Sewer | | Unknown |
| Classic | | $ 2,878.90 |
| Cooks Pest Control | | $ 1,254.00 |
| FastSigns | | $ 3,175.84 |
| Great American Bus Products | | $ 1,125.15 |
| HD Supply Facilities Maint. | | $ 2,388.34 |
| Interior Cleaning Systems | Cleaning Services | $16,000.00 |
| McGriff Seibels & Williams | Insurance | $ 2,755.58 |
| MyNewPlace | | $ 239.00 |
| Roto Rooter | | $ 1,995.60 |
| Sprint | | $ 65.21 |
| Stephens Plumbing | | $ 905.00 |
| * Insider claim | | |
| | **TOTAL** | **$58,011.69** |

## V.    LIQUIDATION ANALYSIS

A review of the Debtor's scheduled claims indicates that the Debtor estimates approximately $30,975.00 is owed for administrative expenses; $48,541.10 is owed to priority creditors; $1,853,115.61 to secured creditors; and approximately $58,011.69 to unsecured creditors.

A review of the Debtor's assets indicates that the Debtor owns approximately $2,918,455.84 (as of date of filing of Voluntary Petition), including machinery, equipment, inventory and other assets at Market Value, and approximately $1,527,420.25 in liquidation Value.

| **ASSET** | **MARKET VALUE** | **LIQUIDATION** |
|---|---|---|
| Real Property | $4,800,000 | $1,800,000 |
| Bank Accounts* | $3,220.25 | $3,220.25 |
| Accounts Receivables | $88,385.59 | $15,000 |
| Office Furniture | $850.00 | $200.00 |
| Equipment and appliances | $26,000.00 | $9,000.00 |
| Tenant Leases* | Unknown | Unknown |
| Contingent Claims vs. PCBB and Sandhills | Unknown | Unknown |
| | | |
| * As of Petition Date | | |
| **NET VALUE TOTAL** | **$2,918,455.84** | **$1,827,420.25** |

### A.      Source of Financial Information

The Debtor's management estimates these values based on its knowledge and experience of more than 20 years of ownership and management of residential apartment complexes. The fair market value reflects a reasonable price the Debtor can expect to attain if it had an extended period of time in which to find a willing buyer in the market for the purchase of its real property.

For the purposes of determining the liquidation value, the Debtor estimated the proceeds it could obtain in a quick sale of the individual assets listed.

## B.    Best interests of Creditors

A review of the Debtor's scheduled claims indicates that the Debtor estimates approximately $30,975.00 is owed for administrative expenses; $48,541.10 is owed to priority creditors; $1,853,115.61 to secured creditors; and approximately $58,011.69 to unsecured creditors. At fair market value, the Debtor has assets which total $4,918,455.84 and in liquidation value, $1,827,420.25.  Therefore, in the event that the Debtor could liquidate its assets for fair market value, creditors would receive payment in full, however, it is doubtful fair market value can be obtained given the current economic conditions.  Given that the Debtor's assets are fully encumbered in favor of the secured creditor (PCBB), in the event that the Debtor liquidated its assets for liquidation value, only the secured creditor would realize a distribution, leaving priority and unsecured creditors without any distribution.

## VI.    FUTURE MANAGEMENT OF THE DEBTOR AND COMPENSATION OF INSIDERS

The Debtor will continue to manage the Montevallo Property.  Apartments Advisors USA ("AAU"), an entity owned by Johnson, managed the Montevallo Property pre-petition, and the Debtor will seek payment of AAU upon reaching positive cash flow.

## VII.    RELEVANT FINANCIAL INFORMATION PROJECTIONS

The Debtor has attached copies of a projected 1 year pro forma, estimating the projected income and expenses of the Reorganized Debtor through June 30, 2011.  A copy of this pro forma is attached hereto as Exhibit "A," and incorporated herein by reference.  However, the Debtor is seeking to either refinance its properties or to sell Ashton Oaks, and either of these events will change the pro forma projections.

## VIII.   PROJECTED VALUE OF VOIDABLE TRANSFERS

The Debtor does not have any avoidable transfers it could pursue.

## IX.   SUMMARY OF NON-BANKRUPTCY LITIGATION

The Debtor does not have any non-bankruptcy litigation currently pending.

## X.   RELEVANT INFORMATION REGARDING DEBTOR'S AFFILIATES

The Debtor has two (2) affiliates which also have bankruptcy cases pending in the Bankruptcy Court for the Middle District of Florida, but these cases have not been substantively or procedurally consolidated, and there is no intention to do so..

## XI.   STATEMENT REGARDING EXECUTORY CONTRACTS

The Debtor hereby assumes any executory contract not specifically deemed rejected during these proceedings or herein.

## XII.   PLAN OF LIQUIDATION

The Debtor proposes a Plan of Liquidation that would divide its creditors into seven (7) classes. The Debtor intends to fund its Plan of Liquidation by selling the Montevallo Property pursuant to the Sale Contract within two (2) months of the completion of repairs to the property (the repairs are estimated to last 90 days from the start of same).  However, in the event that the prospective Purchasers are unable to close on the Sale Contract, the Debtor would require four (4) more months (6 months after completion of the repairs) to market the property for sale to other potential purchasers (the "Marketing Period").  In the event the Debtor is unable  to sell the Montevallo Property within the Marketing Period, the Debtor will implement a stalking horse auction/§363 of the Bankruptcy Code sale procedure which will result in the sale of the Montevallo Property. In the event that the stalking horse auction/§363 sale procedure is implemented, the current

first mortgage holder (PCBB) will have the ability to credit bid up to the amount of its allowed secured claim. In the event that PCBBs credit bid is the winning bid at the auction, PCBB will take the real property subject to the claims of the priority property tax claimants. In the event that a third party is the winning bid at the auction, any proceeds above PCBB's allowed secured claim will then be distributed to creditors in the following order of priority:

a.     Priority property tax claimants
b.     First Mortgage holder (PCBB)
c.     Unsecured Priority Claims
d.     Unsecured claims of non-insiders (in the event that the winning bid is insufficient to satisfy this class of creditors in full, then the amount available for distribution to this class of creditors will be distributed on a Pro-rata basis)
e.     Unsecured claims of insiders
f.     Equity Security Holders

In the event of the sale of the Montevallo Property, the priority claims of the Internal Revenue Service for 2009 payroll taxes in the allowed amount of its claim will be satisfied from the proceeds of the sale and the distribution to creditors as set forth above. However, in the event that the pending sale of the Montevallo Property does not take place, the Debtor will re-market the property, solicit bids and conduct a stalking horse auction/§363 of the Bankruptcy Code sale, and distribute the sale proceeds first to the secured creditors, subject to property tax claims, then pro rata to priority creditors until paid in full, then pro rata to non-insider unsecured claims, then pro rata to insider unsecured claims, then to equity security holders.

A.     **CLASSIFICATION OF CLAIMS**

The Debtor proposes a plan which divides claims and interest into seven (7) classes. The proposed classes are as follows:

**Administrative claims and expenses:**

The Debtor shall pay all administrative claims and expenses within 30 days of the confirmation of the Debtor's Chapter 11 Plan of Liquidation, or as otherwise agreed between the parties involved.

**Class I:** (Impaired) Proven and allowed priority claim of the Internal Revenue Service.

**Class II:** (Impaired) Proven and allowed priority claim of the Tax Assessor of Jefferson County, Alabama.

**Class III:** (Impaired) Proven and allowed priority claim of State of Alabama.

**Class IV:** (Impaired) Proven and allowed secured claim of Pacific Coast Banker's Bank in the approximate amount of $1,842,724.58.

**Class V:** (Impaired) Proven and allowed secured claim of Jefferson County, Alabama in the approximate amount of $10,391.03

**Class VI:** (Impaired) Proven and allowed unsecured claims.

**Class VII:** (Impaired) Equity interest of current equity security holders.

## B. TREATMENT OF CLAIMS

As set forth above, the Debtor proposes to fund its Plan of Liquidation from selling its properties and the proceeds of the sale of its real property and from proceeds derived from the continued operation of its business. The Debtor proposes to pay each class of creditor as set forth below:

**Administrative Expenses:** The Debtor shall pay administrative claims and expenses in full within 30 days of the sale which will fund the Debtor's Chapter 11 Plan of Liquidation, or as otherwise agreed upon between the involved parties.

**Class I:** (Impaired) Class I consists of the proven and allowed priority claim of the Internal Revenue Service. In the event of the sale of the Montevallo Property, the proven and allowed priority claims of the Internal Revenue Service will be satisfied from the proceeds of the pending proposed sale. However, in the event that the proposed pending sale the Debtor will re-market the Property, and implement the sale procedures set forth below.

**Class II:** (Impaired) Class II consists of the proven and allowed priority claim of the Tax Assessor of Jefferson County, Texas in the approximate amount of $36,540.34 for 2008 and 2009 property taxes. In the event the proposed pending sale of the Montevallo Property closes, the priority claims of the Tax Assessor for Jefferson County, Alabama, for the 2008 and 2009 property taxes will be satisfied from the proceeds of the sale. However, in the event that the proposed pending sale the Debtor will re-market the Property, and implement the sale procedures set forth below.

**Class III:** (Impaired) Class III consists of the proven and allowed priority claim of the State of Alabama in the approximate amount of $3,953.32 for 2009 income taxes. In the event the proposed pending sale of the Montevallo Property closes, the priority claims of the State of Alabama, for 2009 state income taxes will be satisfied from the proceeds of the sale. However, in the event that the proposed pending sale the Debtor will re-market the Property, and implement the sale procedures set forth below.

**Class IV:** (Impaired) Class IV consists of the proven and allowed secured claim of Pacific Coast Banker's Bank in the approximate amount of $1,842,724.58, secured by a first lien on the Montevallo Property. The Debtor intends to fund its Plan of Liquidation and satisfy PCBB's proven and allowed claim by selling the Montevallo Property to the  prospective Purchaser within two (2)

months of the completion of the required repairs.  However, in the event that the Debtor is unable to sell the Montevallo Property to the prospective Purchaser, the Debtor will implement a stalking horse auction/§363 of the Bankruptcy Code sale which will result in the sale of the Montevallo Property pursuant to the auction procedures set forth below. Under the Debtor's proposed Plan, this class of creditors will retain its lien to the same validity, extent and priority it enjoyed pre-petition.

**Class V:**  (Impaired) Class V consists of the proven and allowed secured claim of Jefferson County, Alabama in the approximate amount of 10,391.03.  The Debtor intends to fund its Plan of Liquidation and satisfy the proven and allowed claim of this creditor by selling the Montevallo Property to the prospective Purchaser within two (2) months of the completion of the required repairs.  However, in the event that the Debtor is unable to sell the Montevallo Property to the Prospective Purchaser, the Debtor will implement a stalking horse auction/§363 of the Bankruptcy Code sale procedure which will result in the sale of the Montevallo Property pursuant to the auction procedures set forth below. Under the Debtor's proposed Plan, this class of creditors will retain its lien to the same validity, extent and priority it enjoyed pre-petition.

**Class VI:**  (Impaired) Class VI consists of the proven and allowed unsecured claims in the approximate amount of $58,011.69, of which $45,986.38 are general unsecured creditor claims and $12,025.31 are insider unsecured creditor claims. In the event the proposed pending sale of the Montevallo Property closes, the allowed non-insider claims of unsecured creditors will be satisfied from the proceeds of the sale. However, in the event that the proposed pending sale the Debtor will re-market the Property, and implement the sale procedures set forth below. Payments to insider unsecured creditors shall be deferred until all Class VI general unsecured creditors are paid in full.

**Class VII:** (Impaired) Class VII consists of the current equity security holders, who would retain their current interests pending the closing of the currently proposed sale. In the event the proposed pending sale of the Montevallo Property closes, the equity security holder receive all remaining proceeds after the retirement of all secured, priority, and unsecured debt. However, in the event that the proposed pending sale the Debtor will re-market the Property, and implement the sale procedures set forth below.

C.     **AUCTION PROCEDURES**

In the event that the Debtor is unable to sell the Montevallo Property to David Ruvalcaba and Archer Electrical, Inc., then a stalking horse auction/§363 sale free and clear of liens, liens transferring to proceeds of the Montevallo Property will be held after a 120 Marketing Period (which will commence upon the completion of the code compliance repairs and the other improvements proposed by the Debtor). At the auction, the first mortgage holder (PCBB) would be entitled to credit bid up to the amount of their allowed secured claim. In the event that PCBB's credit bid is the winning bid at the auction, PCBB will take the real property subject to the claims of the priority property tax claimants. In the event that a third party is the winning bid at the auction, any proceeds above PCBB's allowed secured claim will then be distributed to creditors in the following order of priority:

a.     Priority property tax claimants
b.     First Mortgage holder (PCBB)
c.     Unsecured Priority Claims (in the event that the winning bid is insufficient to satisfy this class of creditors in full, then the amount available for distribution to this class of creditors will be distributed on a Pro-rata basis)
d.     Unsecured claims of non-insiders (in the event that the winning bid is insufficient to satisfy this class of creditors in full, then the amount available for distribution to this class of creditors will be distributed on a Pro-rata basis)

e.  Unsecured claims of insiders (in the event that the winning bid is insufficient to satisfy this class of creditors in full, then the amount available for distribution to this class of creditors will be distributed on a Pro-rata basis)

f.  Equity Security Holders

## C.  **ALTERNATIVES TO BANKRUPTCY**

The Debtor proposes to fund its Plan of Liquidation from selling its real property.  Should PCBB be allowed to reacquire possession of its collateral, a liquidation sale of the Debtor's assets would not be able to produce enough money to pay off any priority creditors or unsecured creditors since all assets are pledged to the secured lenders.  Therefore, it appears that it is in the best interests of all parties to allow the Debtor to attempt its repayment plan by confirming the Debtor's proposed Plan of Liquidation.

## XIII.  **CONCLUSION**

The Plan of Liquidation proposed by the Debtor provides the best means to ensure that creditors get paid at least some distribution on their allowed claims in a reasonable period of time. Therefore, it appears to be in the best interests of all creditors, the Debtor and the bankruptcy estate to confirm the Debtor's proposed Plan of Liquidation.

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the forgoing Disclosure Statement has been sent this June 3, 2010 to: United States Trustee, Timberlake Annex, 501 East Polk Street, Suite 1200, Tampa, FL 33602; and all parties participating in CM/ECF Electronic Noticing.

/s/ Joel S. Treuhaft
Joel S. Treuhaft, Esq.
2997 Alternate 19, Suite B
Palm Harbor, Florida 34683
(727) 797-7799
Facsimile: (727) 213-6933
FBN: 516929
Attorney for the Debtor